**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **LEADING TECHNOLOGY** | * | |
| **COMPOSITES, INC.,** | * | |
| | * | **Civil Action No. CCB-19-1256** |
| **v.** | * | |
| | * | |
| **MV2, LLC** | * | |

## MEMORANDUM

Leading Technology Composites, Inc. ("LTC") alleges that MV2, LLC ("MV2") has infringed on LTC's patent. Now pending is MV2's renewed motion for partial summary judgment of immunity under 28 U.S.C. § 1498 for any alleged infringement that occurred pursuant to MV2's work on government contracts. (ECF 175). The motion has been fully briefed and oral argument was held on October 23, 2020. For the following reasons, the court will grant the motion.

## FACTS

MV2 designs, makes (through third party manufacturers), and sells armor panels. LTC alleges that MV2's composite armor panels with edge trim infringe on LTC's patent. At issue here are MV2's activities related to the U.S. Navy's PB-X boat program, and the U.S. Army's MSV(L) boat program.

I.    PB-X Program

On March 3, 2017, the U.S. Navy began seeking bids for the production of its patrol boats for its PB-X program by issuing a Solicitation, Offer, and Award No. N00024-17-R-2209. (ECF 175-5, Excerpts of the Solicitation, Offer and Award). Gravois Aluminum Boats LLC, d/b/a Metal Shark, was awarded the contract on September 29, 2017. (ECF 175-6, Excerpts of

Contract). MV2 provided some of the allegedly infringing armor panels to Metal Shark. (ECF 175-10, Purchase Orders). MV2 provides the following purchase orders:

- Purchase Order No. 25058, revised October 23, 2018, for approximately 209 armor panels, due October 31, 2018;

- Purchase Order 31200, for approximately 247 armor panels, due October 23, 2018;

- Purchase Order 46710, dated May 31, 2019, for raw material and final delivery of completed project.

The Purchase Orders refer to "40PB" panels. According to Grey Chapman, one of MV2's owners, the PB-X program is also referred to as the PB-40 or 40PB program. (ECF 175-2, Chapman Decl. ¶ 7). MV2 also provides a purchase order between it and its supplier, Iten Industries, for panels for the PBX Boat Kit, dated September 11, 2018. (ECF 175-10 at 84–85).

The solicitation for the PB-X program and the ultimate contract awarded to Metal Shark incorporated 48 C.F.R. § 52.227-1. (ECF 175-5, Solicitation at 101; ECF 175-6, Contract at 106). This regulation contains three versions of an "authorization and consent." The solicitation and contract refer to the "DEC 2007" version, which states:

> (a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent -
>
> (1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract; or
>
> (2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a United States patent shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

(b) The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, does not affect this authorization and consent.

48 C.F.R. § 52.227-1: Authorization and Consent (DEC 2007).[1]

Section E of the contract (ECF 175-6, Contract at 74) provides that acceptance of delivery is performed by a specific individual or an appointed agent. According to the contract, "Inspection and acceptance of supplies and services will be done at the delivery order level."

In order to test panels for the PB-X project, MV2 shipped sample panels to be tested at Chesapeake Testing, a third-party testing service, with a Navy representative present. (ECF 175-14, Harrison Dep. at 181:2–17). Shane Bartus, who provides consulting services to MV2, was present for the testing in August 2018 and states that it was witnessed by federal employee William Neman of the U.S. Navy. (ECF 175-4, Bartus Decl. ¶ 20). The testing consisted of impacting the sample panels (referred to as test coupons) and documenting the results of those tests, to confirm that the performance of the coupons met the requirements in the Solicitation. (*Id.* ¶ 20). The Navy then qualified and approved MV2's armor solution, and MV2 is required to provide panels pursuant to the approved specifications. (ECF 175-2, Chapman Decl. ¶¶ 18, 19; ECF 175-4, Bartus Decl. ¶¶ 22, 23). According to Bartus, the design of the panels cannot be changed without the Government's approval, and the design encompasses the materials; the time,

---

[1] Effective June 5, 2020, section (b) was slightly changed, and now reads:

(b) The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation (FAR) 2.101 on the date of subcontract award. However, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, as defined in FAR 2.101 on the date of subcontract award, does not affect this authorization and consent.

48 C.F.R. § 52.227-1: Authorization and Consent (JUNE 2020).

temperature, and pressure related to manufacture; and the integration of the manufactured armor components. (Bartus Decl. ¶ 23). Chapman states that the U.S. Navy accepted delivery of two Metal Shark PB-X patrol boats outfitted with MV2 armor panels. (Chapman Decl. ¶ 17).

II.     MSV(L) Program

On October 27, 2016, the U.S. Army Contracting Command issued Solicitation No. W56HZV-15-R-0187 for the MSV(L) boat program. (ECF 175-15, Solicitation Excerpts). Vigor ultimately was awarded the contract on September 28, 2017. (ECF 175-16, Contract Excerpts). MV2 provides purchase orders between it and Vigor. (ECF 175-17). Specifically, MV2 provides: an April 13, 2018, purchase order for engineering of the panels and a September 1, 2019, purchase order for testing and coupons, as well as a March 3, 2020, Vigor MSV(L) armor proposal with certified cost and price data. (*Id.*).[2]

The MSV(L) solicitation and the contract include the December 2007 version of the authorization and consent at 48 C.F.R. § 52.227-1. (ECF 175-15, Solicitation at 172–73; ECF 175-16, Contract at 169). The purchase orders between MV2 and Vigor include the authorization and consent clause for "[a]ll orders expected to exceed the simplified acquisition threshold." (ECF 175-17 at 11).

MV2 produced twenty test coupons for the MSV(L) project. (ECF 175-2, Chapman Decl. ¶ 11; ECF 175-3, Harrison Decl. ¶¶ 10–11). It appears some extra coupons were produced, as MV2 put an unused extra on display at a boat show. (ECF 175-2, Chapman Decl. ¶ 11; ECF 175-

---

[2] LTC points out an alleged discrepancy between the September 1 Vigor purchase orders MV2 attached to its motion (ECF 175-17), and a version of the same purchase order it has, (ECF 181-10), and notes that it is not clear which is the final version (ECF 181, LTC Opp'n at 15). The court sees no discrepancies. MV2 attached three versions of the September 1 purchase order to its motion. The version LTC includes with its motion is the second version of this purchase order for testing and coupons (compare ECF 181-10 with ECF 175-17 at 48–61); MV2 also includes with its motion a third version of the same order, revised on March 13, 2020, that adds armor kits for a vessel prototype (ECF 175-17 at 4–15). MV2 does not claim in this motion to have fulfilled that later order. (ECF 185, MV2 Reply at 7 ("To date, MV2 has sold exactly 20 test armor panels for the MSV(L) project.").

3, Harrison Decl. ¶ 10). The coupons were shipped to the U.S. Army Aberdeen Test Center for testing and were tested there. (ECF 175-2, Chapman Decl. ¶¶ 11, 12; ECF 175-19, November 5, 2018, shipping receipt). Shane Bartus attended the testing in December 2018, and states that the tests were conducted by Test Director Evan Danz and overseen by U.S. Army Test & Evaluation Command MSV(L) Testing Program lead Mark Simon. (ECF 175-4, Bartus Decl. ¶ 14). As a result of the testing, the U.S. Army qualified and approved MV2's armor solution for the program; MV2 will be required to provide armor panels pursuant to these approved specifications, and the panel design cannot be changed without government approval. (Chapman Decl. ¶¶ 12, 13; Bartus Decl. ¶¶ 16–17; Harrison Decl. ¶ 19). According to Bartus, the processing route and integration of the armor cannot be deviated from without the Government's approval, and MV2 is required to provide armor pursuant to the specifications of the test coupons. (Bartus Decl. ¶¶ 16–18). It does not appear any boats with MV2 panels have been produced for the MSV(L) program or accepted by the government as of yet.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477

U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## DISCUSSION

### I.    Motion to Strike the Vigor Contract Excerpts (ECF 175-16)

LTC moves to strike excerpts of the MSV(L) contract between the Army and Vigor from the record on summary judgment. According to LTC, the Vigor contract excerpts are directly responsive to LTC's discovery requests sent on the opening day of discovery, particularly the request for all agreements or contracts relating to MV2 armor panels, and the request for all documents related to MV2's § 1498 defense. (*See* ECF 181-4, Discovery Request Nos. 18 and 20). The contract was produced to LTC on June 11, 2020, outside of the discovery period. (ECF 181-3, Jun. 11, 2020 A. Ruther Email to J. Camacho).

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 26(e) states that a party must supplement responses to interrogatories, requests for production, or requests for admission. And the Fourth Circuit has explained that:

> [I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1)

exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

MV2 first argues that it was not required to produce the Vigor contract exerpts at all because the contract was not within its control. "[D]ocuments are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 515 (D. Md. 2009) (citation and internal quotation marks omitted). This can include where the party has legal control over the documents, or where it has a cooperative, file-sharing relationship with the third party who possesses the documents. *See id.* at 515–16; *Benisek v. Lamone*, 320 F.R.D. 32, 35 (D. Md. 2017) (history of voluntary cooperation shows practical ability to obtain documents from nonparty). Also relevant to the question of control is "(1) the corporate structure of the party/nonparty, (2) the nonparty's connection to the transaction at issue in the litigation, and (3) the degree that the nonparty will benefit from the outcome of the case[,]" as well as "whether the related entities exchange documents in the ordinary course of business, and whether the nonparty has participated in the litigation." *Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564 (D. Md. 2006) (citations omitted).

Whether the Vigor contract was in MV2's control is a close question. There is no evidence that MV2 had legal control over the documents—Vigor and MV2 are separate entities—nor is there evidence that Vigor and MV2 had a cooperative, file-sharing relationship. On the other hand, the Vigor contract's provisions—specifically, the authorization and consent— also allegedly operates to the benefit of MV2, which would appear to give MV2 some ability or

authority to obtain the contract from Vigor. Indeed, Vigor responded promptly to MV2's request when MV2's counsel asked for the contract excerpts, suggesting a practical ability to obtain the documents. (*See* ECF 181-2). To be fair, however, it is not clear to the court why LTC could not have just as easily obtained the contract by serving Vigor with a subpoena. *See* Fed. R. Civ. P. 45.

Because the issue is close, the court finds it appropriate to apply the *Southern States* criteria to determine whether, assuming MV2 was obligated to disclose the documents, the failure to timely produce them was substantially justified or harmless.

As to surprise, LTC was on notice since at least May 2019 that MV2 asserted immunity under § 1498. (ECF 16, Answer at 27). Further, MV2 produced both the solicitation and its purchase orders with Vigor in discovery, which both contain references to the authorization and consent clause. Therefore, while MV2 did not produce the Vigor contract excerpts in discovery, LTC could have inferred that the contract would also contain the authorization and consent clause, and there was no reason for it to think otherwise, especially given that the presence of the clause in the Vigor contract would drive its inclusion in purchase orders between Vigor and MV2. *See* 48 C.F.R. § 52.227-1(b) ("The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are expected to exceed the simplified acquisition threshold."). But, on the other hand, because MV2 did not request or disclose the contract during discovery, LTC may have reasonably assumed that the evidence was not going to be presented as part of MV2's § 1498 defense. On balance, the court finds that LTC could not have been genuinely surprised by the contents of the Vigor contract excerpts, which are consistent with the immunity defense asserted by MV2 from early in this litigation and with the solicitation and purchase orders that were produced during discovery. The cases cited by LTC

are not analogous to the situation in which it finds itself. In *Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 138 (D. Md. 2019), the late disclosure of additional sales data relevant to the defendant's case constituted surprise where information about those sales and the potential witnesses with knowledge of those sales had until that time been "affirmatively redacted" from documents provided in discovery. And in *United States ex. Rel. Rangarajan v. Johns Hopkins Health Sys. Corp.*, 262 F. Supp. 3d 259, 270–74 (D. Md. 2017), the plaintiff made belated (and bizarre) corrections to her deposition, omitted thousands of relevant documents in her discovery responses, and belatedly disclosed (or perhaps fabricated) two documents crucial to her claim after all other evidence in discovery suggested that those documents did not exist.

As to ability to cure the surprise, this factor does not favor exclusion. LTC argues that because discovery had closed, LTC was unable to request discovery regarding the authorization and consent clause in the contract, which it may have done had the contract been disclosed during discovery. LTC was aware of the disclosure more than a month prior to MV2's renewal of its motion for partial summary judgment, however, and the court made clear that in responding to any such renewal, LTC could address the need for additional discovery. (ECF 162, Order Denying MV2's Original Motion for Partial Summary Judgment). LTC did not argue additional discovery was necessary in its opposition, and at oral argument, argued only that it might seek the complete contract. There is no indication that the complete document would reveal additional provisions relevant to immunity. The contract excerpts provide an exhaustive list of clauses contained within the contract, including the authorization and consent clause. It is not clear to the court what further discovery LTC would hope to gain if given the opportunity.

Neither party contends this will delay trial, which has not yet been scheduled. The importance of the evidence factor weighs somewhat in favor of striking the document because the contract is important in establishing MV2's immunity defense.

Finally, the court considers MV2's explanation for the late disclosure, which is that it had no obligation to disclose the Vigor contract because it was not in its control. Again, this is a close question, but MV2 appears to have reasonably believed it was not obligated to provide the contract during discovery.

Regardless of whether MV2 was required to disclose the contract, the court is persuaded that any failure to timely disclose the Vigor contract was harmless. The belated disclosure of the contract has caused no delay in this litigation and LTC was not genuinely surprised by its contents. As noted above, MV2 asserted the immunity defense from early in the litigation and did provide the Army's Solicitation (ECF 175-15) for the MSV(L) program and purchase orders between Vigor and MV2 for MSV(L) armor panels, both of which incorporate the December 2007 version of 48 C.F.R. § 52.227-1, the authorization and consent clause. The court finds it appropriate to consider the Vigor contract excerpts at the motion for summary judgment stage.

Alternatively, LTC argues that the Vigor contract excerpts are inadmissible because the full contract was not produced. The court disagrees.

A party may object to material relied upon in a motion for summary judgment if the material "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). LTC argues that "[b]ecause MV2 has made only a small portion of [the Vigor contract] available to LTC, LTC is not in a position to exercise its right under the rule of completeness and Rule 106 to present the balance of the contract and correct any misimpression created by the excerpts," and the only cure for this predicament is to exclude the contract. (ECF 181, LTC

Opp'n at 11). The court finds that the rule of completeness is unlikely to be implicated by any introduction of the Vigor contract excerpts at trial. "Rule 106 should never come into play unless misleading evidence has been introduced that requires clarification or explanation—otherwise there is no unfairness that needs correction." *United States v. Bailey*, 322 F. Supp. 3d 661, 668 (D. Md. 2017) (citing *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996)). Here, the Vigor contract excerpts require no clarification as to whether they support MV2's claims that the government included the authorization and consent clause in the Vigor contract. The part of the Vigor contract on which MV2 relies contains a list of all Federal Acquisition Regulation ("FAR") clauses incorporated into the contract, including the authorization and consent clause. The production of additional pages of the contract will not change the fact that the clause is included or what the clause means, as its language is determined by federal regulation, at 48 C.F.R. § 52.227-1 (2007).

## II.    Section 1498(a)

Title 28, Section 1498(a) provides in part:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . . For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

"In a lawsuit between private parties, § 1498(a) operates as an affirmative defense, and where a private party's use of a patented invention is 'for the Government' and with the 'authorization and consent of the Government,' that private party cannot be held liable for patent infringement." *Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006). "In general,

there are two important features of § 1498(a). It relieves a third party from patent infringement liability, and it acts as a waiver of sovereign immunity and consent to liability by the United States." *Madey v. Duke Univ.,* 307 F.3d 1351, 1359 (Fed. Cir. 2002).

"A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" *Madey*, 413 F. Supp. 2d at 607 (citations omitted). "A use is with the 'authorization and consent of the Government' where the Government either expressly or impliedly consents to the infringement." *Id.* (citations omitted).

A.    For the Government

"For the Government" requires that "the use or manufacture of a patented method or apparatus occur pursuant to a contract with the government and for the benefit of the government." *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). The court finds that MV2's use and manufacture of the 20 test coupons for the MSV(L) project, (ECF 175-2, Chapman Decl. ¶ 11), the test coupons for the PB-X project, (*Id.* ¶ 16), and the armor panels itemized in the purchase orders attached to the motion, (*Id.* ¶¶ 24, 25), are "for the Government."

That the PB-X and MSV(L) programs are government programs is not in dispute. LTC does dispute, however, whether MV2 has adequately shown that its production of armor panels specifically were for the government, noting that it is possible that these panels could have been sold for commercial purposes also, and that at least one test panel was put on display at the 2018 Work Boat show.

As to the test coupons provided to the government, there is no genuine dispute of material fact that these were for the government. As discussed above, Shane Bartus states in his

declaration that he attended testing of MV2's test coupons for the MSV(L) and PB-X programs, that the testing was witnessed and/or overseen by government employees, and resulted in the U.S Army and U.S. Navy qualifying and approving the armor solution. (*See* ECF 175-4, Bartus Decl. ¶¶ 14–16, 20–22). LTC has produced no evidence to contradict that. Therefore, it is clear that the test coupons were manufactured so that they could be tested and approved by the government, (i.e. for the government's benefit), and pursuant to the government's requirement that the coupons be tested. (ECF 175-15, Solicitation at 101).

Similarly, the armor panels listed in the purchase orders attached to MV2's motion are also for the government. The purchase orders between MV2 and Metal Shark (ECF 175-10) list armor panels, identified in part as "40PB," which is another name for the PB-X program. There is also a purchase order for a "PBX Boat Kit." (ECF 175-10 at 84).[3] The purchase orders between MV2 and Vigor (ECF 175-17) reference the MSV(L) program, and the page titled "MSV(L) Flow Down Clauses" begins with "[b]ecause the Work furnished by Subcontractor will be used in connection with a U.S. Government contract . . . ." (ECF 175-17 at 9). MV2 has provided adequate evidence that the armor panels contained in these purchase orders were for the government. While LTC speculates that the armor panels may have been resold by Vigor or Metal Shark to commercial customers, it provides no evidence to support such a contention.[4]

---

[3] LTC argues that because the purchase orders contain "self-serving MV2 language" that the pricing is strictly confidential and not to be shared without permission from MV2, this raises "questions as to who authored them and how many layers of hearsay are included in those documents." (ECF 181, LTC Opp'n at 30). But Chapman stated in her declaration that what was attached are "true and correct copies of purchase orders between MV2 and Metal Shark and related documents for the PB-X program" and were made at or about the time noted or dated, kept in the course of regularly conducted activity, and were made as a regular practice of MV2's business activity. (ECF 175-2, Chapman Decl. ¶¶ 25, 28 (referring to Exhibit F, which is ECF 175-10, the Metal Shark purchase orders)). LTC provides no evidence to contradict this. LTC also notes that the purchase orders refer to technical documents that were not attached as evidence, but it is not clear why these documents would be relevant.

[4] LTC provides an invoice between Iten Industries and MV2 for "[s]pare parts for PBX 1 and 2" that is shipped to "MV2 arranged." (ECF 181-15). It is not clear how this shows that those PB-X items went to a commercial customer, but regardless, the court grants immunity only for those panels identified in the purchase orders between MV2 and Metal Shark. Neither does the email from Keith Harrison, in which he says he will need tags for panels for

LTC argues that at least one MSV(L) test coupon was not used for testing and was instead displayed at the 2018 Work Boat show—a use that is not "for the Government." In *St.-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 981 (C.D. Cal. 2019), the court found display at a trade show *de minimis* for the purposes of summary judgment under § 1498 when there was no evidence of non-governmental sales. Here, however, MV2 admits it sold panels to one non-governmental client, Freeport McMoRan. Therefore, the display at the work boat show is not covered by § 1498 and is not *de minimis*. As to the coupons that were tested, or the armor panels contained in the purchase orders, however, there is no genuine dispute of material fact that each was for the government.

B.    With the Authorization and Consent of the Government

i.    PB-X Program

The government sometimes includes or incorporates express authorizations and consent clauses in its contracts. As noted by another district court:

> The federal procurement regulations recognize the varying types of consent that may be included in certain Government contracts. For example, the federal procurement regulations at 48 C.F.R § 27.201-2(b) and 48 C.F.R § 52.227-1 for federal research and development contracts provide an example of a "broad" authorization and consent clause using the following language: "[t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier." 48 C.F.R § 52.227-1 . . . . In contrast, 48 C.F.R § 27.201-2(a) and 48 C.F.R § 52.227-1 provide in other instances for inclusion of a narrower or "limited" authorization and consent clause, based on the use of language which grants the Government's authorization and consent, but only where (i) the patented invention is embodied in the structure or composition of an article accepted by the Government, or (ii) the patented invention is used in tools or methods which

---

demo boats "for this project at least," show that the panels in the purchase orders with Metal Shark and Vigor went to commercial customers. (ECF 181-16). Further, to the extent that other documents identified by LTC show unaccounted for armor panels (ECF 181-17, ECF 181-18), this memorandum is limited to determining whether MV2 is immune with regard to the test coupons provided to the government and the panels identified in the purchase orders. Therefore, to the extent LTC has identified unaccounted for armor panels, the court need not address that now.

> necessarily results from compliance with specifications in the contract or specific written instructions from the contracting officer.

*Madey*, 413 F. Supp. 2d at 608 (citation and footnote omitted). When the government provides a limited authorization and consent, "that limited consent operates as a limited waiver of sovereign immunity and should be narrowly construed so as not to find consent and impose potential liability on the Government where the terms of the consent clause are not fully met." *Id.* at 609. But the court should also consider the purposes of § 1498, and construe the authority broadly to "allow the Government to consent to patent infringement in order to obtain desired goods, services, or research for the United States, with appropriate royalties paid to the patent holder in a suit against the Government in the Court of Federal Claims for this taking." *Id.* at 608.

The parties dispute whether MV2's purchase order contracts with Metal Shark were subject to the authorization and consent clause contained in the prime contract. The prime contract between Metal Shark and the U.S. Navy incorporates by reference the December 2007 version of the authorization and consent clause in FAR 52.227-1. (ECF 175-6, PB-X Contract at 106). That authorization and consent provides "[t]he Government authorizes and consents to all use and manufacture, in performing this contract *or any subcontract* at any tier . . ." 48 C.F.R. § 52.227-1(a) (emphasis added). It further provides, "omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, does not affect this authorization and consent." 48 C.F.R. § 52.227-1(b).[5] Therefore, if the authorization and consent is in the main contract, it would also apply to subcontracts under this contract.[6]

---

[5] As noted above, the language was changed slightly, effective June 2020. Because the contract incorporates the December 2007 version, the court uses that version.

[6] This is true even if the subcontract at issue is not expected to exceed the simplified acquisition threshold. *Id.* For this reason, LTC's arguments that the government's authorization and consent could depend on alleged disputed issues as to the exact value of Vigor and Metal Shark purchase orders or the value of the simplified acquisition threshold are not well taken.

Here, the evidence provided by MV2 (the PB-X contract and purchase orders) indicate that the authorization and consent is incorporated in the contract, and the purchase orders were subcontracts pursuant to the prime contract. LTC has not provided evidence to dispute this. *Connell v. KLN Steel Prod. Ltd.*, which LTC cites to, is distinguishable. No. 04 C 194, 2009 WL 691292 (N.D. Ill. Mar. 16, 2009), dismissed sub nom. *Connell v. KLN Steel Prod. Co.*, 449 F. App'x 14 (Fed. Cir. 2010). There, language in the prime contract, which contained an authorization and consent clause, indicated that subcontract purchases would be made under separate GSA contracts, rather than the prime contract. *Id.* at *12. Therefore, there was a genuine issue of fact as to whether the subcontract for the allegedly infringing product operated under the prime contract or the GSA contracts. *Id.* There is no such similar language here.[7]

The authorization and consent contained in the main contract provides that the Government authorizes and consents to all use and manufacture of any invention "[e]mbodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract[.]" 48 C.F.R. § 52.227-1.[8] MV2 argues that acceptance by the government is not necessary for § 1498 immunity to apply. It is not clear how MV2 reaches this conclusion. The scope of the authorization and consent provided for in the PB-X contract makes clear that

---

[7] While it is true that the entire contract is not in the record, LTC cannot create a genuine issue of material fact by speculating as to what might be in the rest of the contract, or by noting parts of the contract that are missing without stating why those portions are relevant. Further, LTC argues that there is no sponsoring witness from Metal Shark or the government to authenticate the PB-X contract. MV2, for some reason, addressed this argument in the context of the MSV(L) contract, noting that it would make the contract admissible at trial through the testimony of a qualified witness from Vigor, but did not do so for the PB-X contract. Regardless, it appears the contract can easily be made admissible through the testimony of a witness from Metal Shark, and LTC presents no genuine questions as to its authenticity. *See Sanchez*, 402 F. Supp. 3d at 139.

[8] In contracts for goods, courts have found that clause 1 of FAR 52.227-1 (requiring acceptance) applies, rather than clause 2 (requiring that the use be necessary). *Saint-Gobain*, 369 F. Supp. 3d at 973–75 (citing cases). As this is a contract for goods, it appears that 52.227-1(a)(1) is applicable.

the government's authorization and consent only extends to those items that are accepted by the government under the contract.[9]

On the other hand, the court also disagrees with LTC's argument that MV2 must show that the government has accepted delivery of each allegedly infringing panel under the terms of the contract. The district court in *Robishaw Engineering Inc. v. United States* provided the following helpful discussion about when a contractor obtains immunity under § 1498, as compared to when the government is amenable to suit.

> Where the contractor is supplying materials to the government, this clause, with one exception, provides that the government's authorization and consent occurs when the government accepts delivery under the contract. . . . It is important to note that the contractor's immunity under § 1498 generally begins before § 1498 relief against the government becomes available in the Court of Federal Claims. While the patentee generally must wait to sue the government under § 1498 until after the government accepts delivery of the disputed item, the government's contractors are immune from suit as soon as they engage in manufacture or even bid to supply products to the government. As a result, there will often be a period—beginning with the contractor's bid for or performance under the government contract, and lasting until delivery under the contract—during which a patentee will have no remedy for the government contractor's use of its patent. Ultimately, the patentee may recover compensation covering this period when the government accepts delivery of the allegedly infringing items and the patentee sues the United States for compensation under § 1498.

891 F. Supp. 1134, 1140–41 (E.D. Va. 1995) (citations and footnote omitted).

This view is supported by *Trojan, Inc. v. Shat-R-Shield, Inc.*, in which the Federal Circuit held that § 1498 prevented the court from issuing injunctive relief "barring manufacture, sale, or bidding to supply" the allegedly infringing product to the government. 885 F.2d 854, 856 (Fed. Cir. 1989). The Federal Circuit stated that "[i]n short, a patent owner may not use its patent to

---

[9] MV2 argues that if it shows that the contract contains an explicit authorization and consent clause, it need not show that the allegedly infringing products were accepted by the government. (ECF 185, MV2 Reply at 5). But here, the authorization and consent clause only covers the use or manufacture of an invention embodied in articles accepted by the government. Therefore, the court must decide whether MV2's use or manufacture falls within the scope of that clause, which requires a determination of whether the government accepted the allegedly infringing panels.

cut the government off from sources of supply, either at the bid stage *or during performance of a government contract.*" *Id.* at 856–57 (emphasis added). The Federal Circuit's language indicates that the purpose of § 1498 is also to protect contractors during the performance of the contract, which is not consistent with the view that contractors are subject to suit while fulfilling a contract up until the point where the government ultimately accepts delivery of the allegedly infringing product.

Here, Chapman states in her declaration that the U.S. Navy has qualified and approved MV2's armor solution, and that MV2 is required to provide armor panels pursuant to the approved specifications of the PB-X test coupons. (ECF 175-2, Chapman Decl. ¶¶ 18–19; *see also* ECF 175-4, Bartus Decl. ¶¶ 20–22 (stating he attended the tests)).[10] The PB-X test coupons are among those that LTC alleges infringe its patent, (Chapman Decl. ¶ 21), so they presumably contain the allegedly infringing edge trim. The U.S. Navy's qualification and approval is enough to demonstrate acceptance by the government for the purposes of § 1498.[11] This is different than in *TecSec, Inc. v. Adobe Sys. Inc.*, which LTC cites to, and in which the only evidence that the Adobe Acrobat and the PDF format were for the government and with the government's authorization and consent was that the government uses Acrobat and relies on PDF, and Acrobat conforms to broad standards required by the government. 326 F. Supp. 3d 105, 112 (E.D. Va.

---

[10] LTC argues that these statements contain inadmissible hearsay, are "impossible to reconcile with the manner in which the contract states that testing results will be determined," and are not supported with any documentation. (ECF 181, LTC Opp'n at 20). It is not clear how the statements contain hearsay, and LTC does not elaborate. The government's approval and qualification of the armor panels under the contract would appear to have independent legal significance. *See Jude v. Health Mgmt. Assocs. of W. Va., Inc.*, 187 F.3d 629 (Table), 1999 WL 595352, at *2 (4th Cir. 1999). That MV2 is required to provide armor panels pursuant to the approved specifications does not appear to be a statement of a third party, so it is not hearsay. Finally, MV2 provides sworn statements as to these facts, and LTC does not explain why additional documentation is needed.

[11] Chapman also states that the Government has accepted delivery of two PB-X program patrol boats outfitted with MV2 armor panels. (Chapman Decl. ¶ 17). LTC argues that this might be hearsay as it is not clear how Chapman would know this. The court need not reach this issue because it finds that the approval of the test coupons and armor solution, and the requirement that other armor panels meet those specifications, suffices to show acceptance.

2018). Here, the U.S. Navy's approval and qualification of the test panels, in combination with the express authorization and consent clause, is much different than the government simply purchasing and using Adobe Acrobat. Further, although it is not clear if the panels have been delivered to and accepted by the government under the terms of the contract, LTC has not provided any evidence that the government will not accept panels that it specifically approved, and that are in accordance with specifications which the government has required MV2 to follow.

To the extent LTC argues that the government must have specifically authorized and consented to the edge trim, or that the specifications must have required MV2 to include edge trim, this is not required. Here, the express authorization and consent requires only that the Government accept the allegedly infringing product. *See Saint-Gobain*, 369 F. Supp. 3d at 972–74 (comparing clause 1 of 52.227-1, which is applicable to supply contracts and provides that only acceptance is needed for authorization and consent, with clause 2, which is applicable to service contracts and provides that the allegedly infringing method must be required or necessary).

Accordingly, the evidence MV2 provided is sufficient to demonstrate the authorization and consent of the government, at least to entitle MV2 to immunity during the performance of the contract, and at least without any evidence—and none has been offered—that the government ultimately rejected the panels. The significant work MV2 has done pursuant to the PB-X contract without objection by the government is consistent with a finding that any infringement is with the government's authorization and consent. MV2 has shown not only that it manufactured the PB-X test coupons and shipped them to Chesapeake Testing, but also that after the testing, it received purchase orders from Metal Shark for approximately 456 panels for the government.

ii.    MSV(L) Program

Because the MSV(L) prime contract excerpts include the same authorization and consent clause as the PB-X contract, 48 C.F.R. § 52.227-1, and the Army has also qualified and approved MV2's armor solution, it appears there is express authorization and consent to infringement for the twenty MSV(L) test panels MV2 has delivered to and tested for the government. (*See* ECF 175-16, Contract at 169; ECF 175-2, Chapman Decl. ¶ 12). But even if the court did not consider the belatedly disclosed prime contract, MV2 has still adequately shown that the government implicitly provided authorization and consent for the test panels.

"[I]mplied consent may be found, for example, 'by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, [or] by post hoc intervention of the Government in pending infringement litigation against individual contractors.'" *Madey*, 413 F. Supp. 2d at 609 (quoting *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976)). It may also be found where "(1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Id.* at 609 (quoting *Larson v. United States*, 26 Cl. Ct. 365, 370 (1992)). "Implied authorization and consent will also be found where the government requires the private contractor to use or manufacture the allegedly infringing device." *Id.* But because "implied authorization and consent operates as a waiver of sovereign immunity," it "should be narrowly construed." *Id.*

In a Federal Circuit case addressing implied authorization and consent, *TVI Energy Corp. v. Blane*, TVI Energy alleged that Blane had infringed on its patent when, in bidding on a government contract and as required by the government, Blane conducted live demonstrations of the allegedly infringing product, a disposable thermal target. 806 F.2d 1057, 1059 (Fed. Cir.

1986). The Federal Circuit found that Blane was immune under § 1498, because the Government had given its implicit authorization and consent. *Id.* at 1060. Specifically, the "Government authorization was expressed by the specific requirement that Blane demonstrate, under the guidelines of the bidding procedure, the allegedly infringing targets at Fort Knox." *Id.* And the "mere fact that the Government specifications for the targets did not absolutely require Blane to infringe TVI's patent at that demonstration [did] not extinguish the Government's consent." *Id.*

In contrast, *Leupold & Stevens, Inc. v. Lightforce USA, Inc.*, 449 F. Supp. 3d 1015, 1022 (D. Or. 2020) found that "the Government's purchase and acceptance of an allegedly infringing product [was not] sufficient to prove that the Government intended to accept liability for a specific act of infringement." *Id.* There, the defendant Nightforce[12] provided no evidence that the Government knew that the product at issue (scopes) contained allegedly infringing features, or that it was the sole supplier of scopes or that it manufactured the scopes solely for the government. *Id.* at 1023. In denying summary judgment, *Leupold* also distinguished *TVI*, noting that *Leupold* concerned contractual sales, not pre-contract bids, and that after a contract has been formed, courts have sometimes been more hesitant to impose additional liability on the Government through a finding of implied authorization and consent. *Id.* at 1022–23 (citing *Hutchinson Indus. Inc. v. Accuride Corp.*, No. CIV.A.09-1489FLW, 2010 WL 1379720, at *7 (D.N.J. Mar. 30, 2010), *dismissed*, 449 F. App'x 26 (Fed. Cir. 2010) (noting that courts have more broadly construed the government's implied authorization and consent in the bidding context, and citing cases)).

While the issue is close, MV2 has adequately demonstrated the government's implied authorization and consent to entitle it to summary judgment. On the one hand, there is no

---

[12] The defendant was Lightforce USA but does business as Nightforce Optics and Nightforce USA.

evidence the government was aware that the MV2 panels contained allegedly infringing features, and this case concerns allegedly infringing items supplied after a contract was formed and not as part of a bid. On the other hand, the specific government requirement, pursuant to the Vigor contract, that MV2 deliver for testing "20 coupons for each unique armor coupon solution" (ECF 185-15, Solicitation at 101), is strikingly similar to the bidding requirement in *TVI* that Blane demonstrate the alleged infringing target for the government. As in *TVI*, MV2's "only purpose in demonstrating the [panels] was to comply with the Government's [contractual] requirements." *TVI*, 806 F.2d at 1060. Moreover, whereas in *Leupold* the government had merely purchased a product which happened to have infringing features, here the government has approved and qualified the allegedly infringing design. *See Leupold*, 449 F. Supp. 3d at 1023. Chapman and Harrison state that the government qualified and approved the "armor solution" tested at the Aberdeen Proving Grounds (ECF 175-2, Chapman Decl. ¶ 12; ECF 181-7, Harrison Dep. at 280 ("The opaque armor has been tested.")), and Chapman, Harrison and Bartus state that the tested design cannot be changed without the government's approval (ECF 175-2, Chapman Decl. ¶ 13; ECF 175-3, Harrison Decl. ¶ 12; ECF 175-4, Bartus Decl. ¶17–18).[13] The court finds that by requiring MV2 to "use . . . the allegedly infringing device," *Madey*, 413 F. Supp. 2d at 609, and approving its design, the government has impliedly authorized and consented to any infringement with respect to the twenty MSV(L) test panels.

---

[13] LTC's reference to ongoing "back and forth" between the Army and MV2 regarding testing requirements and the design of the armor solution appears to relate only to unresolved issues that have nothing to do with the structure of the panel itself, such as the square footage of panels the Army needs (ECF 181-9, Chapman Dep. at 58), or to the requirements of some "transparent armor" submitted for testing (ECF 181-7, Harrison Dep. at 280–81). The alleged infringing panels are the "opaque armor," not the "transparent armor." (*See, e.g.*, ECF 185-1, Chase Rep. at 16). Further, to the extent that Harrison discussed in his deposition conversations with the Army that were necessary to "fully qualify the design" of the transparent armor, this supports Harrison's, Chapman's, and Bartus's statements in their declarations that an approved design under the contract cannot be changed without government approval. (ECF 181-7, Harrison Dep. at 280–81).

## CONCLUSION

Accordingly, the court will grant MV2's motion for partial summary judgment. The court finds that MV2 is immune from suit under § 1498 as to the test coupons manufactured and provided to the government for the PB-X and MSV(L) programs, and as to the armor panels for the PB-X program identified in the purchase orders with Metal Shark at ECF 175-10. Further, MV2 also cannot be held liable for inducing others to infringe with respect to these panels, because § 1498 immunity also extends to claims of indirect infringement. *Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1277–78 (Fed. Cir. 2015).

Because this memorandum may involve discussion of information designated Confidential and/or Attorneys' Eyes Only by the parties throughout this litigation, and the court has found good cause to seal such information, this memorandum will be issued under seal, with the condition that it will be fully unsealed in 45 days unless either party shows good cause for specific redactions to the memorandum. The parties are directed to confer and submit any proposed redactions to the court within 30 days of this memorandum and order. The court finds, after considering less restrictive alternatives, that this course adequately balances the interests at issue under *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567 (4th Cir. 2004).

A separate order follows.


11/20/20_____                                    __/S/_____
Date                                                Catherine C. Blake
                                                    United States District Judge