**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **LEADING TECHNOLOGY COMPOSITES, INC.** | * | |
| | * | |
| *Plaintiff*, | | |
| v. | * | **Civil Case No. 1:19-cv-01256-ABA** |
| **MV2, LLC** | * | |
| *Defendant*. | * | |

* * * * * * * * * * * * * * * * * *

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Leading Technology Composites, Inc. ("LTC") and Defendant, MV2, LLC ("MV2") are before the Court because MV2 seeks an order compelling LTC to return an exemplar product that MV2 produced in discovery. MV2 still considers the exemplar to be its property and contends that it may provide further support for MV2's currently pending Motion for Attorney Fees. (ECF No. 325). As set forth more fully below, the Court finds that the exemplar panel enjoys attorney work product protection, and will not order its return at this time.

## I. BACKGROUND

LTC unsuccessfully sued MV2 for patent infringement involving competing anti-ballistic armor panels used in military, law enforcement, and commercial vehicles, with this Court's decision to that effect coming on May 30, 2024, when summary judgment in favor of MV2 for non-infringement was granted. (ECF No. 320). The Federal Circuit affirmed on February 11, 2026. (ECF No. 345).

On June 1, 2026, the parties notified the Court of a dispute regarding the return of what remained of an exemplar panel that MV2 had provided to LTC for testing and analysis pursuant

to a discovery request in August of 2019. (ECF No. 353). At the time it provided the exemplar, MV2 indicated, "These samples[1] are not confidential and LTC may do whatever it would like with them." (ECF No. 358-1). The exemplar has also been referred to as an "unused extra" panel. (ECF No. 171 at 4). [2] The parties had no other agreement regarding a testing protocol, destructive or otherwise, nor did they address the post-testing, post-discovery or post-litigation disposition of the panel.[3]

After receiving the exemplar panel, LTC provided it to its designated expert, Dr. Adam Cardi, who, *inter alia*, subjected the panel to destructive analysis by cutting various cross sections from the panel so as to analyze its material components and structure. Dr. Cardi provided a report of his opinions detailing this analysis, and he was also deposed by MV2. Dr. Cardi's analysis, together with various images of the panel post-testing, have been referenced and relied upon in various filings by LTC. *See, e.g.*, ECF No. 171 at 6.

Central to the infringement dispute was whether language originally in the preamble to the patent acted as a functional limitation on the scope of the patent. Specifically, the preamble includes that the invention is "for resisting edge impact penetrations by ballistic projectiles."[4] LTC

[1] Though some of the parties' correspondence suggests that two exemplar panels were going to be provided, apparently only one ultimately was.

[2] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. If there are none, the Court is referring to the page number of the PDF.

[3] In the Court's experience, this lack of testing protocol and provision for the post-testing disposition of the exemplar is unusual, as such matters are often initially contested—sometimes to the point of requiring court intervention--including whether and how testing will take place, who may attend, how will it be documented, and when and if the exemplar will be returned. *See, e.g., Merchandani v. Home Depot USA*, 235 F.R.D. 611 (2006), Obviously such a protocol would have avoided the current situation.

[4] As the Court understands it, traditionally, the ability of a panel to withstand a ballistic projectile diminishes as one moved from the center of the panel to its edge; LTC's panels allegedly represent, *inter alia*, an improvement on the anti-ballistic performance at the edges of a panel.

contended that this was not a claim limitation or functional limitation but is merely a statement of purpose for an "apparatus" patent. (*See Generally*, ECF No. 281, *LTC Renewed Motion for Summary Judgment*). If correct, LTC would only need to show the composition and structure of MV2's panel to prove infringement, not any operational quality such as anti-ballistic performance. Thus, in LTC's formation of the issue, ballistic performance testing would be unnecessary and irrelevant. MV2, by contrast, argued that the language was a functional limitation. (*See Generally*, ECF No. 293, *MV2 Opposition and Cross-Motion for Summary Judgment*). If correct, MV2 urged that LTC would need to prove that MV2's panel's ballistic performance was enhanced at the edges of the panel as set forth in LTC's patent - something that MV2 argued would require ballistic performance testing by LTC.

The parties maintained their respective positions through cross motions for summary judgment on the issue of infringement. LTC further argued however that even if the disputed language *was* a functional limitation, LTC had generated adequate proof in discovery to create a genuine dispute of material fact so as to preclude summary judgment of noninfringement. LTC pointed to an email and deposition of an MV2 principal that suggested that the MV2 panel had some degree of edge impact protection. (ECF No. 304 at 12-13). There was also the report and deposition of LTC's expert Dr. Cardi, who opined that, based on an analysis of its materials and structure, MV2's panel *would be expected* to have some edge protection given its similarity in composition and structure to LTC's panel.[5] He buttressed this by arguing that earlier versions of LTC's panels that had the same "characteristics" as the MV2 panel had provided such protection during LTC's own ballistic performance testing conducted well before the litigation. Although Dr. Cardi's analysis was "destructive" in that he cut cross sections and corresponding pieces out

---

[5] Neither was referenced in LTC's Renewed Motion for Summary Judgment. (ECF No. 281).

of the panel provided to LTC in discovery by MV2, Dr. Cardi did no ballistic performance testing of the MV2 panel according to LTC.

This Court granted MV2's motion, finding that MV2's panel did not infringe. (ECF No. 320). This Court held that the disputed language regarding edge ballistic performance was a functional limitation.[6] The Court also found that the evidence cited by LTC regarding MV2's statements about performance, and Dr. Cardi's report on how MV2's panel would hypothetically perform under ballistic testing were insufficient to create a genuine dispute of material fact. (ECF No. 319 at 29). The Court expressed no opinion regarding whether LTC would have needed to conduct ballistic performance testing of the MV2 panel to prove infringement. *Id.*

LTC reiterated its argument to the Federal Circuit on appeal, which affirmed. (ECF No. 345). On repeated questioning at oral argument before the appellate court as to why it did not perform ballistic testing on the exemplar panel, LTC asserted that it didn't think it needed to do such testing given its argument that the "for resisting" language did not act as a functional limitation, and that it didn't want to further destroy the exemplar panel provided by MV2 in discovery by performing ballistic testing because it thought it needed to preserve the panel "for other purposes." (Oral Argument recording at approx. 8:45 to 11:30). LTC was also quite clear that no ballistic performance testing of the MV2 exemplar panel was performed by Dr. Cardi. *Id.*

## II. THE PRESENT DISPUTE

Almost immediately after summary judgment regarding non-infringement was granted in its favor by this Court in May of 2024, MV2 asked for the remains of the exemplar panel to be returned, and it reiterated that request shortly after the Federal Circuit affirmed that decision in

[6] The Court differed slightly from MV2s' argument regarding the contours of the functional limitation, finding that "for resisting" meant that the anti-ballistic qualities at the edge of the panel would equal the anti-ballistic qualities of the center of the panel. (ECF No. 319 at 22).

February of 2026. (ECF No. 359-1 at 11-14). LTC voiced no substantive opposition to that request until March 31, 2026, when, for the first time, it asserted both an ownership interest in the exemplar panel and work product protection regarding the panel. (ECF No. 359-1 at 8).

The parties now ask the Court to rule on whether the panel must be returned. U.S. District Judge Adam Abelson referred this dispute to the undersigned on June 5, 2026. (ECF No. 354). The parties submitted their position statements on June 16, 2026, pursuant to the undersigned's informal discovery dispute procedure. (ECF Nos. 358 and 359). An in-person hearing was held on July 7, 2026. After the hearing, the Court requested additional briefing from the parties, received on August 11, 2026, and September 1, 2026. (ECF Nos. 369 and 371), as well as LTC's September 16, 2026, Reply (ECF No.373). LTC also submitted the panel at issue for in camera review by the undersigned that took place on July 16, 2026. Along with the panel, LTC submitted an affidavit from counsel for in camera review that served to orient the Court in its review of the panel. (A sealed copy of that affidavit is attached as Attachment A). The Court did not otherwise rely on the affidavit.

## III. ANALYSIS

At the hearing, MV2 explained that it seeks return of the panel to assist in its pending Motion for Attorney Fees pursuant to 35 U.S.C. § 285, filed on June 13, 2024, shortly after summary judgment was granted in its favor. (ECF No. 325). In essence, MV2 seeks return of the panel to determine whether or not LTC decided to perform its own ballistic performance testing on the panel separate from Dr. Cardi's destructive analysis, notwithstanding LTC's insistence throughout the litigation that the panel's actual performance was irrelevant to whether or not MV2 infringed the patent. (ECF No. 371 at 7). Of course, that fee motion has already been filed without the benefit of the panel, and MV2 includes several arguments in its motion already, including that

LTC has taken inconsistent positions regarding whether certain language included in the patent acted as a functional limitation. As the Court understands MV2's reasoning, if LTC undertook such ballistic performance testing and the results suggested that MV2's panel did not infringe, that would provide yet another reason why LTC's continued pursuit of this case would be "exceptionally meritless" or otherwise meet the standard allowing the recovery of attorneys fees and costs. Alternatively, if LTC strategically decided *not* to perform such testing when it had the ability to do so, it would serve further evidence of its bad faith pursuit of the infringement case.

For its part, LTC has articulated four reasons why the return of the exemplar panel should be denied. First, LTC respectfully questions whether the Court has the authority at this point to order the return of the panel pursuant to its inherent powers to oversee the discovery process. Second, LTC asserts an ownership interest in the panel based on MV2's instruction that LTC could "do whatever it liked" with the exemplar, thus acting as a conveyance of same. Third, LTC asserts work product protection over the exemplar panel as its production would allow MV2 to determine whether or not LTC conducted ballistic performance testing at some point to assist LTC in its litigation decision-making and strategy.

As set forth more fully below, the Court concludes that this issue does fall within its inherent authority over discovery matters (i.e., the conditions under which material produced in discovery should be returned to the producing party). Second, the Court need not reach the question of the ultimate ownership of the exemplar panel to decide the limited issue before it. Third, the Court concludes that the very information MV2 seeks here to help support its fee motion-- the decision-making and accompanying strategic litigation choices surrounding whether or not to conduct ballistic performance testing on an exemplar - directly implicates what the

work product doctrine is designed to protect. This is true especially in light of the marginal and cumulative support that such information might provide to MV2's fee motion.

**A. Inherent Power**

At oral argument, LTC directed the Court to *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381-82 (1994) in support of its assertion that the Court's inherent powers to oversee discovery did not extend to this dispute. *Kokkonen*, however, did not involve the assertion of a court's inherent authority to address discovery matters. Instead, *Kokkonen* addressed whether a court could exercise ancillary subject matter jurisdiction over enforcement of a settlement agreement when neither the court nor the parties invoked the continuing jurisdiction of the court in the agreement or the accompanying Rule 41(a)(1) dismissal order. Notwithstanding its different focus, *Kokkonen* does provide some guidance as to whether this Court can or should address the related state law question as to whether the language accompanying the transfer in this case was sufficient to transfer title. As will be addressed in Section B below however, the Court concludes that it need not reach that jurisdictional question as it can address the limited question before it without determining the ultimate ownership of the exemplar.

Plaintiff also cited *Degen v. U.S.*, 517 U.S. 820 (1996), but that case is ultimately unhelpful to Plaintiff's cause. Substantively, *Degen* involved a different question: whether a criminal fugitive could nonetheless contest the civil forfeiture of his property. The lower court held that pursuant to its inherent authority, it had the power to strike Degen's defenses pursuant to the so-called "fugitive disentitlement doctrine" without hearing them, and the Supreme Court disagreed. *Id*. at 829. It is true that in so doing, the Court cautioned against an expansive interpretation of inherent powers, but the Court also recognized both "the general power of a

court to protect their proceedings and judgments in the course of discharging their traditional responsibilities," and a court's "usual authority to manage discovery in civil a suit…" *Id*. at 823 and 826.

To be blunt, but for the discovery process, LTC would never have received the exemplar. *See, e.g.*, *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34 (1984) (observing that, "Indeed, as a general matter, plaintiff would not have any right to the material at issue but for the discovery procedures set forth in the Federal Rules of Civil Procedure"). LTC obtained the exemplar through Rule 34(a)(1)(B) of the Federal Rules. Had MV2 resisted production of an exemplar, the Court certainly would have had the power to compel it. Had MV2 moved for return of the exemplar during the discovery period, the Court would have had the power to address it. Had the production of the exemplar followed the traditional approach, with the parties agreeing on (or asking the Court for) a protocol for the testing and post-testing disposition of the exemplar, the Court would have had the power to enforce that agreement. However, the parties' failure to do so cannot divest the Court of such powers. And LTC's foot-dragging on formally objecting to returning the exemplar for two years after MV2 first requested it in June of 2024 in large part accounts for the timing of this dispute comes to the Court now rather than then.

**B. Ownership**

Both parties have asserted an ownership interest in the exemplar as a stand-alone justification either for LTC to keep the exemplar or for the Court to order its return to MV2. But even if the Court were to decide it has power to resolve title to the exemplar and chose to do so, that would not, by itself, compel the result that each side seeks.

LTC cites *U.S. v. Proctor & Gamble Co.*, 19 F.R.D. 149, 150-51 (D.N.J. 1954), however that case did not involve a request for return of physical evidence produced in civil discovery based on an assertion of ownership. Instead, the moving party sought return or suppression of copies of documents previously provided pursuant to a grand jury subpoena in a criminal investigation so that they could not be used by the Government in a subsequent civil suit. The moving party's theory was not based on ownership, but instead argument that the documents were tainted by the Government abuse of the grand jury subpoena process when it had no intention of pursuing a criminal prosecution. *Id.*

MV2 cites *Jones v. Clinton*, 12 F.Supp.2d 931, 938 (E.D. Ark. 1998) in support of its argument that providing material in discovery does not, by itself, bestow a property interest on the requesting party in that material. In *Jones*, the court was addressing which discovery materials would enjoy continued protection from public disclosure and under what circumstances. Plaintiff argued that she had a fifth amendment property interest in videotapes of depositions she had noticed such that the court should not restrict her use of such materials. *Id.* In finding no such property interest, the Court noted the U.S. Supreme Court's holding in *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34 (1984)[7] that "[l]iberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes." *Id.* The court continued "Indeed, as a general matter, plaintiff would not have any right to the material at issue but for the discovery procedures set forth in the Federal Rules of Civil Procedure. The Court thus rules that plaintiff has no property interest in the discovery materials she has amassed." *Id.* But *Jones* does not address whether language such as that accompanying

---

[7] *Rhinehart* held that a litigant's first amendment interests were not unreasonably restricted by requiring compliance with a court-ordered protective order. *Rhinehart* at 30-31.

production in the present case that LTC could "do whatever it would like" with a non-confidential "unused extra" exemplar panel is sufficient to convey to LTC some ongoing interest in the exemplar.

MV2's reliance on *DiTommasi v. DiTommasi*, 340 A.2d 341, 345-46 (Md. App. 1975) to answer that question is not dispositive, as it involves the level of certainty required to transfer real property. There, in the context of ownership of a house, the Appellate Court of Maryland found that statements including "you can have the house" were insufficient to establish donative intent in a divorce proceeding. In so holding, that relied upon the Maryland Supreme Court case of *Withers v. Douglas*, 110 A.2d 513, 515-17, which found that a note stating "I am paying no more the house is yours—do what you want with it" was similarly insufficient to establish such intent.

Establishing title under state law may well be outside this Court's supplemental jurisdiction given the post-appeal state of the instant case. But even if the Court were to reach whether ultimate ownership of the exemplar rested with one party or the other based on the record currently before it, that would not be determinative of whether the Court should or should not order the immediate return of the exemplar to MV2 so as to assist MV2 in its pending fee motion as MV2 urges. If the Court determined that LTC now owns the exemplar, the Court could still order its temporary production to MV2 to assist it in its pending fee motion absent any other countervailing interest. And if the Court determined that MV2 retained ownership of the exemplar, it could still prevent, at least at this juncture, the immediate return of the panel to MV2 if there was a sufficiently compelling reason.

Though not directly on point, *U.S. v. Kriesel*, 720 F.3d 1137 (9th Cir. 2013) provides a somewhat helpful example where "ownership" by itself did not compel production. *Kriesel* involved a criminal defendant who provided a blood sample to the Government as a term of his supervised release and moved for return of that sample once his supervised release period expired pursuant to Rule 41(g)[8] of the Federal Rules of Criminal Procedure, although he did not seek expungement of the "DNA Profile" based on his blood sample that the Government maintained in its national database. *Id.* at 1139. The Government countered that its retention of the sample was required to corroborate any "matches" to a person's DNA profile. *Id*. The Ninth Circuit first upheld the lower court's finding that the sample was, indeed, the defendant's property and normally property may be returned once the Government no longer has a need for the property as evidence. *Id*. at 1144 The Court nonetheless agreed with the lower court that the Government still had a compelling interest in retaining the property to support the integrity of the national DNA database. *Id*. at 1144-47.

The Court turns to the strength of each side's interest in the exemplar in the context of MV2's request for its immediate return.

**C. LTC's Asserted Work Product Interest Over the Exemplar**

LTC asserts work product protection over the exemplar pursuant to Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure. (ECF No. 369 at 4). "Opinion work product [] contains 'the fruit of an attorney's mental processes, or, in other words, the mental impressions, conclusions, and opinions or legal theories of an attorney or other representative of a party concerning litigation.'" *Paice, LLC v. Hyundai Motor Co.*, 302 F.R.D. 128, 134 (D. Md. 2014)

---

[8] Rule 41(g) allows a defendant to petition for the return of seized property under certain circumstances.

(citations omitted). LTC emphasizes that courts have specifically recognized such protection regarding decisions made by attorneys as to what, and what not, to have experts test. *Id*. For example, *Shoemaker v. Gen'l. Motors Corp.*, 454 F.R.D. 235, 236 (W.D. Mo. 1994) held that a litigation opponent could not be present during nondestructive product testing by a consulting expert. *See also Rasnic v. FCA U.S. LLC*, 2018 WL 3861167 at * 7 (D. Kan. Aug. 14, 2018) (court similarly holding). While it is true that both *Shoemaker* and *Rasnic* noted that a litigation opponent could normally overcome such protection in the context of destructive testing and demand a right to be present at such testing, MV2 declined to exercise that right in this case when it empowered LTC to "do whatever it would like" with the exemplar panel produced without any protocol or request to be present. Further, as the above caselaw makes clear and as acknowledged by MV2 at the hearing, testing decisions involving a non-designated consulting expert would enjoy such protection. (See Hearing Tr., ECF No. 368 at 33-24). The Court also finds instructive *Novartis Pharm. Corp. v. Abbott Labs*, 203 F.R.D. 159, 163 (D. Del. 2001), a patent case, where the court found that the work product doctrine was sufficient to block a litigation opponent's request to depose a company witness on what testing was performed and why.

The Court must also point to a unique aspect in this case related to the particular type of testing at issue: ballistic performance testing. The nature of such testing, unlike other analysis, is such that the panel now perfectly embodies the attorney decision-making protected by the opinion work product doctrine. If there are indications of projective impact or penetration, then MV2 will know LTC's attorneys made a strategic litigation decision to perform such testing *and* what the results. If not, then MV2 will know LTC's attorneys made the strategic litigation

decision not to perform such testing. In either case, production of the panel and its inspection will allow MV2 to reverse engineer the decision-making of LTC's attorneys.

*Vardon Golf Co., Inc. v. BBMB Golf Ltd.*, 156 F.R.D. 641, 646-47 (N.D. Ill. 1994), comes the closest to the present situation in justifying work product protection over attorney-directed decisions regarding testing. In *Vardon*, plaintiff alleged that defendant's golf club heads incorporated certain reinforcement technology, infringing plaintiff's patent. At some point in the litigation, to assess defendant's exposure, defense counsel directed that certain clubs from defendant's product line be cut open and analyzed. In discovery, plaintiff sought production of those clubs selected, along with any photographs taken. Defendant objected, claiming work product protection over counsel's selection of which clubs to analyze, the method of analysis, and how that process would be photo-documented. The court agreed, finding such selection and analysis to be opinion work product, stating:

> The selection of the clubs to be cut open is strongly indicative of the mental impressions, conclusions, opinions, or legal theories of [defendant's] attorneys, since [defendant's] club heads are not cut open during the ordinary course of business, and that each club head chosen to be cut open was done so at the direction of its attorneys in response to this litigation. Each particular club to be cut open for inspection was selected by [defendant's] counsel after the start of this litigation. The selection process involved thus clearly implicates the mental impressions, conclusions, opinions, or legal theories of the attorneys for [defendant].

*Id*. at 647; *but see Caracci v. American Honda Motor Co.*, 2021 WL 4459468 at *5 (Sept. 29, 2021, N.D. Ill.) (court finding that *whether* testing was performed and a general description of that testing not protected).

As to the photographs of that analysis, the *Vardon* court further noted:

> [T]he taking of photographs of the cut-open samples involves an additional layer of opinion work product. In selecting which club head to photograph, which features of the club heads to photograph, and what angle to take the photographs

> from, the attorney makes a number of decisions about which club heads and what features of the club heads potentially infringe upon the [plaintiff's] patent.

*Id*.

This Court agrees with the *Vardon* court's analysis of the situation presented to it. But what if the *Vardon* defendant then provided a club so selected and tested to a designated trial expert who, in turn, did his own destructive analysis of that club, the pieces of which were then incorporated into his produced report by way of photograph, and relied upon by that defendant in subsequent dispositive motion briefing as LTC did here? The Court finds that any work product protection that might have otherwise applied to the *physical condition* of the panel at the time it was provided to Dr. Cardi was waived by Dr. Cardi's reliance on the panel in his report and analysis. Under such circumstances, LTC could not reasonably expect to limit the future use of the physical condition of the panel at the time of its disclosure to its litigation expert, resulting in a limited waiver. *See Continental Cas. Co. v. Under Armour, Inc.*, 537 F.Supp.2d 761, 770-73 (D. Md. 2008). Further, the Court does not find that the physical condition of the panel belies the nature or results of such pre-Cardi analysis to the extent any was performed so as to allow MV2 to "reverse engineer" same. At most, it might disclose that some testing was performed, and perhaps enough to allow MV2 to determine the general nature of that testing, but such general information does not enjoy protection. *See Caracci*, *supra*. That is in contrast of course to ballistic performance testing which leaves a footprint from which the results of such analysis can, at least in part, be gleaned, but which LTC represents was not performed prior to Dr. Cardi's receipt or by Dr. Cardi himself after receipt. The Court finds no reason to question the accuracy of that representation as to that time period.

There is an important caveat. Any such waiver would not amount to "subject matter" waiver under the circumstances of this case as urged by MV2. *See Duplan Corp. v. Deering*

*Milliken, Inc.*, 540, 1215, 1223 (4th Cir. 1976) (Court holding that opinion work product waiver does not result in subject matter waiver). Any such waiver applies only to the physical condition of the panel to that point, and would not extend to the specific results of any analysis of the panel performed by a consulting expert prior to the panel being produced to Dr. Cardi.

The above reasoning however does not necessarily apply to the decision-making around whether or not to perform ballistic performance testing *after* this Court's decision in favor of MV2 and after the Federal Circuit's opinion issued, which is the time period relied upon by LTC to protect against production of the panel. (ECF No. 369 at 6-7). As stated in their initial brief, "In anticipation of its defense against MV2's forthcoming fees motion, LTC's counsel evaluated and made strategic legal decisions on whether to subject the armor panel to post-appeal testing." (*Id.* at 6). As opposed to other testing, the condition of the panel post-ballistic performance testing is intimately tied to attorney opinion work product, as it would disclose what portions of the panel were selected for testing and the specific performance of the panel under such testing or, alternatively, would verify the attorney decision-making that no such testing would be performed. As succinctly stated by LTC, "Returning the panel (which MV2 did not even consider confidential) will enable MV2 to access LTC's counsel's opinion work product. Exposing the physical condition of the armor panel to MV2 would reveal the protected pattern of selection and tactical decisions LTC's counsel made in preparation for defending against MV2's fees motion." (ECF No. 369 at 7).

Moreover, this assertion was timely made within one month of the Federal Circuit's decision in contrast to LTC remaining silent on the work product issue in response to previous requests. And there has been no subsequent reliance on such testing (if any) by LTC in defense of the fee motion so as to constitute a waiver. Accordingly, the Court finds that disclosing the current

condition of the panel would impermissibly reveal opinion attorney work product that was timely asserted and not otherwise waived as to whether or not to subject the panel to post-appeal ballistic performance testing. The fact that the pending matter is post-appeal does not serve to obviate such protection. *See Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 43 (D. Md. 1974) ("The qualified immunity of documents within the work product doctrine does not end when the lawsuit for which the documents were prepared terminates.") (citing *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973)).

### D. MV2's "Substantial Need" for the Exemplar to Support its Motion for Attorney Fees

Rule 26(b)(3)(A)(ii) allows for potential production of materials otherwise protected as work product if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id*. Even under such circumstances however, Rule 26(b)(3)(B) instructs that a court "must protect against disclosure of the mental impressions conclusions, opinions or legal theories of a party's attorney or other representative concerning the litigation." Read together, these Rule 26 provisions set forth a more limited protection for so-called "fact" work product but an absolute protection for "opinion" work product. That distinction is sometimes elusive, but the Court need not reach it definitively here because MV2 cannot Rule 26(b)(3)(A)(ii)'s standard in any event.

One fundamental problem for MV2 is that the motion for which it seeks the protected material is already fully briefed. At the July 9, 2026, hearing, LTC pointed out that MV2 filed

its Motion for Attorney Fees more than two years ago,[9] such that it did not justify the return of the exemplar now. Stated otherwise, if MV2 had a "substantial need" to include this additional argument regarding whether or not LTC should have or did perform ballistic performance testing, it should have raised this issue formally with the Court at an earlier point, according to LTC. MV2 counters that it began asking LTC for the return of the exemplar just after summary judgment was granted, only to be slow-walked by LTC, who did not raise an objection but did ask for a deferral of the issue. This reasoning however does not apply to the post-appeal decision-making regarding whether or not to perform ballistic performance testing which LTC now seeks to protect and as to which the Court has determined work product protection applies. Further, although MV2 questions both LTC's consistency[10] in asserting that the "for resisting" language did not impose a functional limitation (so as to require testing to prove infringement) and the legal support for such an argument, whether or not LTC itself performed ballistic performance testing is not dispositive of either issue.

Dated: September 24, 2026

J. Mark Coulson
United States Magistrate Judge

United States District Court For The District Of Maryland

---

[9] MV2's accompanying memorandum in support was filed about month after its motion on July 18, 2024. (ECF No. 339). Additionally, MV2 renewed its motion on April 9, 2026, to incorporate appellate aspects of LTC's continue pursuit of MV2. (ECF No. 350).

[10] This "consistency" argument is not one for the Court to resolve in the context of the present dispute, although the Court observes that LTC has argued at least since its first summary judgment motion that the "for resisting" language does not impose a functional performance requirement that would need to be demonstrated to support infringement. *See* ECF No. 171 at 20 ("LTC requests the Court to determine that the "for resisting" claims of the preamble is not a functional limitations that must be proven to show infringement")